## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Linda O'Risky<br>10630 Copperline Road East<br>Evansville, IN 47712 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | )    Case No. _____<br>) |
| Mead Johnson Nutrition Co.<br>2701 Patriot Boulevard<br>Glenview, IL 60026 | )<br>)<br>)<br>) |
| Defendant. | )<br>) |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE,
## AND MONETARY RELIEF AND JURY DEMAND

### Preliminary Statement

1.    This is a civil action against Mead Johnson Nutrition Company ("Mead Johnson" or the "Company") for declaratory, injunctive, and monetary relief for injuries Plaintiff Linda O'Risky has sustained as a result of Mead Johnson's retaliation against her in violation of the Food Safety Modernization Act, 21 U.S.C. § 399d; the Sarbanes-Oxley Act, 18 U.S.C. § 1514A; and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C. § 78u-6(h); and for retaliatory discharge in violation of the public policy of the state of Illinois.

2.    Ms. O'Risky, former Global Product Compliance Director for Mead Johnson, began her career in the Mead Johnson Nutrition division of Bristol-Myers Squibb in 1990. Over the course of 2015, Ms. O'Risky was marginalized and eventually terminated after she began raising and escalating concerns about serious safety issues related to defects in the manufacture of Mead Johnson's ready-to-use infant formula ("RTU"), as well as a culture and organizational

1

structure that increasingly prioritized profits over safety and compliance.

3.     In early 2015, Mead Johnson's eight-ounce RTU began showing signs of spoilage and defective seals in batches that had been manufactured since late 2014. Ms. O'Risky first learned of the defective seal problem on or about March 11, 2015, when she was copied on an email stating that Mead Johnson planned to reject three batches – nearly one million units – of eight-ounce RTU due to leaking seals. She then discovered that the dates of manufacture were nearly two months earlier, suggesting that there could be even more products with a similar problem, which could result in, among other things, contamination during storage and shipping.

4.     Over the next seven months, Ms. O'Risky diligently tried to persuade her managers to comply with Food and Drug Administration ("FDA") regulations and deal with this issue responsibly, to no avail. She escalated her concerns within and outside her chain of command, again with no success. After Ms. O'Risky raised the issue at a Quality Council meeting in April 2015, Dr. Dirk Hondmann, the Company's Chief Scientific Officer, expressed concern. Dr. Hondmann, like Ms. O'Risky, was aware that Mead Johnson touted its hermetically sealed liquid formula as inherently safer than powdered formula, particularly for at-risk infants such as pre-term babies and those with compromised immune systems. Mead Johnson finally began an inquiry, but the individuals assigned to investigate the problem falsely claimed that a defective seal did not constitute a food safety or FDA compliance problem, since any spoilage resulting from a defective seal would be obvious to a consumer.

5.     Ms. O'Risky noted that a defective seal could allow microorganisms and other contaminants into the packages after sterilization during product cooling, storage or transit, and moreover, that FDA regulations are clear that defective processes and incidents of spoilage in the market must be reported to regulators, particularly for low-acid thermally processed foods in

hermetically sealed containers and for infant formula. She provided the regulations and examples of FDA guidance and enforcement actions to fellow members of the Quality Council, and other senior management officials, but they dismissed her concerns.

6.     In the meantime, the attempt to whitewash and downplay the problem persisted. It became clear that senior management's hope was that the defective products would make their way through the marketplace without any major incidents of harm to consumers and without having to fulfill their legal obligations to report the known problem.

7.     Facing ongoing resistance and hostility from management officials, Ms. O'Risky elevated her complaints to Mead Johnson's Integrity Concern hotline, first in April 2015, and again in August 2015. On several occasions, Ms. O'Risky met with compliance personnel to discuss the issues. Although her complaints were ostensibly anonymous, both reflected the same concerns she had been raising for months and cited to the same regulations she had been referencing in communications with management. Accordingly, everyone who was familiar with her position on the eight-ounce RTU issue assumed or knew that Ms. O'Risky had made the complaint.

8.     As a direct and proximate result of Ms. O'Risky's conscientious reporting and protected activity about these issues, her managers began excluding her from meetings, withholding critical information from her, and impeding her ability to do her job. They ultimately targeted her for termination through a reduction in force ("RIF"), claiming it was a necessary part of Mead Johnson's Fuel for Growth initiative, which was to involve cost-cutting and layoffs. Just weeks before, however, Company executives had represented to investors during an October 22, 2015, call that "compliance [would] remain a key component of the way [Mead Johnson does] business," and that that was why Mead Johnson did not address

compliance in the Fuel for Growth initiative. Moreover, the manner in which Mead Johnson handled Ms. O'Risky's termination, immediately confiscating her computer, requiring her to leave the premises by noon and escorting her out of the building – which Mead Johnson did not do to any other Evansville employee who was laid off – was clearly retaliatory and evidenced a concern about the issues she had raised.

9.     At the time of Ms. O'Risky's termination, Mead Johnson had not taken any steps to remove defective, dangerous RTU products from the market or alert consumers to the risks, nor had it reported the deviations to the FDA. In fact, it was only after being notified of Ms. O'Risky's employment claims that Mead Johnson contacted the FDA.

**JURISDICTION**

10.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1367(a).

11.     This Court has jurisdiction over Plaintiff's Food Safety and Modernization Act ("FSMA") claim pursuant to 21 U.S.C. § 399d(b)(4)(A), which permits the Plaintiff to remove her claim from the Department of Labor to an appropriate United States District Court if the Secretary of Labor has not issued a final decision within 210 days after Plaintiff filed her complaint with the Occupational Safety and Health Administration ("OSHA"). Plaintiff filed her FSMA complaint with OSHA more than 210 days ago, on March 28, 2016.

12.     This Court has jurisdiction over Plaintiff's Sarbanes-Oxley Act ("SOX") claim pursuant to 18 U.S.C. § 1514A(b)(1)(B), which permits the Plaintiff to remove her claim from the Department of Labor to an appropriate United States District Court if the Secretary of Labor has not issued a final decision within 180 days. Plaintiff filed her SOX complaint with OSHA more than 180 days ago, on March 28, 2016.

13. This Court has jurisdiction over Plaintiff's Dodd-Frank Act claim pursuant to 15 U.S.C. § 78u-6(h)(1)(B)(i).

14. This Court has jurisdiction over Plaintiff's Illinois retaliatory discharge claim because it is so related to her federal claims that it forms part of the same case or controversy, and alternatively because the parties are citizens of different states and the amount in controversy exceeds $75,000.

15. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), as Plaintiff worked approximately 10 to 15% of her time in the Glenview, Illinois headquarters of Mead Johnson; the Glenview office handles all employee compliance complaints, including those underlying Plaintiff's legal claims asserted herein; and many of Defendant's relevant decision-makers and its executive team were based in or had permanent offices in Glenview and Plaintiff regularly interacted with them, via telephone calls, email, and conference calls, in Glenview. Accordingly, a significant portion of the events giving rise to Plaintiff's claims occurred in this judicial district, including the decision to terminate Plaintiff's employment.

## PARTIES

16. Linda O'Risky is a citizen of the state of Indiana who resides at 10630 Copperline Road East, Evansville, IN 47712. At all times relevant to this matter, she was an employee of Mead Johnson.

17. Mead Johnson Mead Johnson Nutrition Co. is a Delaware corporation headquartered at 2701 Patriot Boulevard, Glenview, IL. At all times relevant to this matter, Mead Johnson was an employer subject to Illinois law and the anti-retaliation provisions of the Food Safety Modernization Act, the Sarbanes-Oxley Act, and the Dodd-Frank Act.

## FACTUAL ALLEGATIONS

### Ms. O'Risky's History with Mead Johnson

18.     Ms. O'Risky worked with Mead Johnson – and, prior to that, in the Mead Johnson

Nutrition division of Bristol-Myers Squibb – as a consultant and employee for more than 25

years.  For the latter part of her career, she worked primarily in Mead Johnson's Evansville,

Indiana facility, and spent approximately 10 to 15% of her time at Mead Johnson's headquarters

in Glenview, Illinois.  Her second-line supervisor for much of this period, including at the time

of her termination, was Jeffrey Jobe, who was also based in Evansville but had a permanent

office assigned to him in Glenview.

19.     Ms. O'Risky has a degree in chemical engineering, and she worked both in

research and development and in various quality and compliance leadership roles at Mead

Johnson.  Ms. O'Risky is certified by the National Registry of Food Safety Professionals in food

safety and hazard analysis critical control point ("HACCP"), and has completed HACCP

trainings with BRC Global Standards and AIB International.  She has also completed courses at

the FDA-sanctioned Better Process Control School at Rutgers University, which included

components on the FDA's low-acid canned food ("LACF") requirements.  These LACF

requirements are incorporated by reference in the Infant Formula Act.

20.     In her most recent role at Mead Johnson as the Director of Global Product

Compliance, Ms. O'Risky had direct responsibility for regulatory compliance activities.  She

received favorable reviews, bonuses and promotions throughout her career with Mead Johnson

and Bristol-Myers Squibb.

21.     Despite her successes, Ms. O'Risky occasionally faced resistance to her efforts to

6

ensure that Mead Johnson adhered to its legal and regulatory duties and its responsibility to its

consumers to ensure that Mead Johnson sold quality products. For example, from 2006 through

2010, she had served as North American Quality Associate Director, in which she headed a team

of approximately 150 permanent and temporary employees responsible for supply chain quality.

In this position, her second-line supervisor was Jeffrey Jobe, Senior Vice President Global

Supply Chain, who often interfered with her quality assurance efforts. For example, in or around

July 2007, Mr. Jobe opposed Ms. O'Risky's intention to hold back batches of Gentlease based on

the presence of insects in certain samples. Ultimately, Mr. Jobe acquiesced, and over the next

few years Ms. O'Risky implemented a series of aggressive measures to ensure better pest control

in Mead Johnson's facilities. A few years later, in early 2011, then-Chief Executive Officer

Steve Glosby thanked Ms. O'Risky for ensuring that Mead Johnson did not face the same fate as

Abbott Laboratories' Ross Products, which had recalled millions of containers of its infant

formula and had endured a public relations disaster for having "bug parts" in its products,

resulting in losses of tens of millions of dollars. Privately, however, Mr. Jobe maintained that

the insects were not a food safety issue, and that Ms. O'Risky had overreacted.

22.     Largely because of incidents like this and the resistance she faced from Mr. Jobe,

Ms. O'Risky returned for several years to the research and development ("R&D") side of Mead

Johnson's business, serving as Associate Director of Product Development. During this time,

she coauthored several patent publications for Mead Johnson and was published in the peer-

reviewed *Journal of Food Composition and Analysis*, having represented the company in an

important effort to define specification limits for key nutrients in infant formula.

23.     In 2013, Ms. O'Risky accepted a promotion to Global Product Compliance

Director, returning to the quality and compliance side of Mead Johnson after three years in

7

product development. Peter Van Dael, Vice President Global Regulatory and Nutrition Science, and Dirk Hondmann, Chief Scientific Officer, recruited her to the position, promising to provide her with the staff and support she needed to succeed.

24.     In her new role, Ms. O'Risky was responsible for conducting internal auditing for quality, food safety and regulatory compliance at MJN-owned and operated manufacturing and R&D facilities, and her team was responsible for driving corrective actions to all audit observations. Ms. O'Risky also oversaw Mead Johnson's global consumer complaint system and sought to bring the Mead Johnson complaint process into compliance with Infant Formula Act regulations. Ms. O'Risky also facilitated the corporate Quality Council, a multidisciplinary group charged with overseeing quality issues and setting policies and best practices. For a time, the Quality Council met monthly and, among other things, reviewed audit results and corrective action processes. After Mr. Jobe joined the Quality Council while serving in the dual role of Senior Vice President of Technical Operations and acting Vice President of General Quality Assurance, the group began meeting less frequently and discontinued tracking corrective actions.

25.     In her role as Global Product Compliance Director, Ms. O'Risky reported to Dr. Van Dael, who, in turn, reported to Dr. Hondmann. Unfortunately, Dr. Van Dael soon cut her budget and did not fill promised support positions, creating challenges for her as she sought to improve Mead Johnson's compliance and complaint-handling processes. Worse, Ms. O'Risky again found herself interacting regularly with Mr. Jobe, with whom she had one-to-one meetings to discuss her concerns with specific ongoing and unaddressed audit concerns, particularly spray dryer maintenance issues, deficiencies in environmental contamination controls, and shortcomings in regulatory compliance with FDA infant formula complaint-handling for U.S.-exported infant formulas. Mr. Jobe was extremely defensive and often told her that she was

overstepping her bounds by raising specific quality issues in Quality Council meetings, which he claimed should be about general policy only – a position inconsistent with the charter of the Quality Council.

### Ms. O'Risky's Early Efforts to Address the Eight-Ounce RTU Formula Issue

26.     On March 11, 2015, Ms. O'Risky was copied on an email from Jose Perez, Technical Services Manager, to Mr. Jobe notifying him that three batches of eight-ounce RTU products – nearly one million units – were likely going to be rejected due to leaking seals. Ms. O'Risky had rarely seen even one entire batch of RTU product be rejected for a quality concern, let alone three.

27.     Ms. O'Risky also knew from her role in analyzing incoming consumer complaints that there had been an increased rate of complaints about RTU formula spoilage, and in February 2015, she had asked her subordinate Kate Witt to start requesting that consumers send products back to Mead Johnson for forensic analysis by Mead Johnson's Quality Assurance laboratory.

28.     On March 19, 2015, Ms. O'Risky reviewed a laboratory summary from Quality Assurance regarding a seal defect in two bottles returned by customers from another batch of eight-ounce RTU. The batch was manufactured around the same time as the three batches identified in Mr. Perez's March 11, 2015 email. Ms. O'Risky wrote to Susan Ruggier in Mead Johnson's Quality Control department to inquire as to whether there were similarities in the defects, and Ms. Ruggier confirmed that that was the case. Ms. Ruggier also stated that Russell Roehr, Manager of Evansville Quality Assurance, was aware of the issues, and that Mead Johnson had implemented several corrective actions, although she did not have any details.

29.     On March 20, 2015, Brian Shira, Associate Director North America Quality, said that Mead Johnson had a project on "reducing cocked closures." This was the first of several

explanations Mead Johnson offered for the problem.

30.     Not satisfied with Dr. Shira's response, which failed to identify either a root cause or a remedial action for the many units of the product that had already shipped, Ms. O'Risky continued to pursue the issue and conducted extensive research on applicable regulations and examples of FDA enforcement actions and recalls arising from issues similar to those Mead Johnson had observed.

31.     On several occasions, Ms. O'Risky spoke in person with Niall Mullane, Director of Global Food Safety, about the eight-ounce RTU issue, expressing her concern that Mead Johnson had not properly addressed it. In their meetings, Dr. Mullane largely dismissed her concerns. He denied that the FDA's low-acid canned food ("LACF") regulations, 21 C.F.R. § 113, which mandate reporting on spoilage and seal deviations, were applicable to Mead Johnson's infant formula products. Ms. O'Risky countered that the Infant Formula Act clearly references the LACF regulations and noted that the FDA audits Mead Johnson's manufacturing processes for compliance with those regulations. Dr. Mullane said he was not aware of those facts, but still maintained that there was no food safety issue because the product had been sterilized at the plant, and that the worst that could happen was spoilage of the product. Ms. O'Risky pointed out that there was no way of Mead Johnson knowing what microorganisms had entered the product post-sterilization in Mead Johnson's process or after it left Mead Johnson's plant, but Dr. Mullane again claimed that there was no risk and no need to notify the FDA.

32.     Ms. O'Risky followed up with emails to Dr. Mullane in mid-March 2015 reiterating her ongoing concerns. Dr. Mullane responded on March 25, 2015, deferring to Dr. Shira for any further questions.

33.     Having made no progress with Dr. Shira or Dr. Mullane, Ms. O'Risky decided to

10

escalate the matter further. On March 25, 2015, Ms. O'Risky wrote to Colin Rudolph, Chief

Medical Officer, and stated the following:

> I originally raised this concern with Niall [Mullane] on March 16th. I think this is
> a serious issue. Evansville rejected 3 batches manufactured on Jan 15 due to the
> same issue we now have a customer complained about on a Dec batch. I'm not
> satisfied they found the issue and addressed it at the onset. Niall seems reluctant
> to state there is the potential for food safety issue. I re-read the [Standard
> Operating Procedures] for potential recall and I have escalated to him and to Rick
> [Baumgart, Vice President, Supply Chain, the Americas]. I have complied with
> the SOP by escalating to Quality. And, I've put it in front of Rick. I'm meeting
> with him again in the morning to find out what they plan to do. We are seeing an
> increase in complaints for leakage. I've asked Brian [Shira] if we likely have
> failures in the market and he replied saying there is a project to fix it going
> forward. That doesn't address the potential for illness. The way this is supposed to
> work, is I escalate to Quality and they take appropriate action…but what if I don't
> feel they are?

34.      Dr. Rudolph did not respond to Ms. O'Risky's March 25, 2015 email in writing,

but he informed her in subsequent conversations that Mead Johnson had alerted the appropriate

people responsible for reporting the issue to the FDA, and that he thought this was a legal issue

beyond the scope of her team's duties.

35.      Ms. O'Risky continued to pursue the issue with members of the Mead Johnson's

management team over the next several weeks and beyond. On March 30, 2015, during a one-

to-one meeting with her supervisor, Dr. Van Dael, she said that she wanted to raise the eight-

ounce RTU issue in the upcoming Quality Council meeting. Dr. Van Dael responded that he

thought that Mr. Jobe, who in addition to his role as Senior Vice President of Technical

Operations had served as acting Vice President of Quality since August 2014, would feel

attacked. Ms. O'Risky disagreed, and she raised the issue in her next two one-to-one meetings

with Dr. Van Dael, who seemed unwilling to support her in pursuing the matter, particularly

before the Quality Council.

36.      Ms. O'Risky again addressed the eight-ounce RTU issue with Dr. Rudolph in a

one-to-one meeting on April 6, 2015. Dr. Rudolph acknowledged the potential risks, but expressed concerns that it would not be possible to improve Mead Johnson's culture with respect to quality issues as long as Mr. Jobe was acting as Vice President of Quality. Dr. Rudolph said that he feared Mr. Jobe was more concerned on downplaying any given quality issue within the organization, rather than on addressing them and finding ways to avoid them in the future.

37.     While it was clear that Dr. Van Dael and Dr. Rudolph understood Ms. O'Risky's concerns, it was equally apparent that she would need to continue to escalate the issue further. Therefore, on April 9, 2015, she drafted a complaint and conveyed the contents by telephone to Mead Johnson's Integrity Concern compliance hotline. Ms. O'Risky described the serious concerns she had about product safety, Mead Johnson's failure to adhere to its legal and regulatory obligations, and an organizational structure that created a conflict of interest and stifled any meaningful remedial action. With respect to the latter point, Ms. O'Risky noted that Mr. Jobe's dual role as Senior Vice President of Technical Operations and acting Vice President of General Quality Assurance had allowed him to intimidate subordinates in Quality and Internal Audit roles into not reporting the true severity of a defective product or process. She explained that the performance objectives for Quality personnel included reducing the number of product write-offs and market actions (e.g. recalls and withdrawals), which clearly incentivized these employees to downplay risks rather than objectively assessing them. Ms. O'Risky also reported that she was told "to consider only reports of death and serious illness from Health Care Professionals as credible and to consider all other consumer complaints . . . as not credible," and to benchmark Mead Johnson's complaint processing to that of Mead Johnson's competitors "to determine if there [was] an opportunity to be less complaint with the applicable [FDA reporting] laws."

38.     In addition to submitting her complaint, Ms. O'Risky contacted Stanley Barringer, General Counsel for the Americas and Europe, who was also a member of the Quality Council, on April 10, 2015. Mr. Barringer suggested that Ms. O'Risky raise the issue at the Quality Council meeting schedule for April 13, 2015, specifically noting that it would be an optimal time to do so because Mr. Jobe would not be in attendance.

39.     On April 13, 2015, Ms. O'Risky led the regularly scheduled Quality Council meeting. In addition to Ms. O'Risky, the attendees included Mr. Barringer, Dr. Hondmann, Dr. Mullane, and Dr. Van Dael. At the end of the meeting, Ms. O'Risky raised her concerns about the eight-ounce RTU issue. The Quality Council asked Dr. Mullane to commence an investigation, and to keep the group updated on the progress.

40.     Per the Quality Council's directive, on April 13, 2015, Dr. Mullane convened a meeting of an investigatory team, which initially included Ms. O'Risky, Dr. Hadley, Mr. Barringer, Dr. Valentine, Ms. Witt, Dr. Shira, Betsy Eisenhut (Direct of Quality for North America and Latin America) and Ferhan Ozadali (Thermal Process Specialist). Notably, Dr. Ozadali said during the meeting that this was the first he had heard of any seal issues, which was highly suspicious, given that part of his FDA-mandated role was to review any deviations in seals and other critical parameters of sterilization processes.

### Efforts by Mead Johnson's Management Team to Silence Ms. O'Risky

41.     As Ms. O'Risky expected – and as her colleagues had predicted – Mr. Jobe was angry that she had escalated the eight-ounce RTU issue. On April 15, 2015, Ms. O'Risky had a telephone call with Craig Hadley, Associate Director North America Regulatory Affairs, regarding a conference call he had had the previous night with Mr. Barringer, Dr. Rudolph, Dr. Christina Valentine (Director of Medical, North America), Dr. Mullane, Mr. Jobe, and Steven

13

Braun (Vice President of Global Research and Development Operations). Dr. Hadley said that

Mr. Jobe seemed agitated throughout the call and was angry that there was even an investigation

into the potential problems with the eight-ounce RTU bottles, which he suggested were not

serious.

      42.     During their April 15, 2015 call, Dr. Hadley reported that Drs. Valentine and

Rudolph had also downplayed the issue, claiming that a baby likely would not get ill from

drinking spoiled milk caused by improperly sealed containers, and that any microorganisms

entering through the foil seal after the product shipped likely would not cause illness. Ms.

O'Risky was incredulous and asked how the doctors could know what sorts of microorganisms

could enter through the seal in the cooling water after sterilization, in trailers during transit, or in

warehouses, on retailer shelves, or in the hospitals or homes where the product was ultimately

used. Ms. O'Risky also raised concerns about potentially contaminated product being consumed

by babies who were not completely healthy, such as newborns or infants with compromised

immune systems. Dr. Hadley dismissively said that no further discussion was needed.

      43.     During the April 15, 2015 call, Ms. O'Risky also asked Dr. Hadley whether Mead

Johnson intended to notify the FDA of the issue pursuant to its obligations under 21 C.F.R. §

108.35(d) and (e), which mandate reporting to the FDA "any instance of spoilage or process

deviation the nature of which indicates potential health significance" and "any instance wherein

any lot of such food . . . may be injurious to health be reason of contamination with

microorganisms" where such food has entered distribution. Dr. Hadley claimed there was no

such obligation because there would always be some level of spoilage in RTU products. Ms.

O'Risky also cited to 21 C.F.R. § 350a, which requires a manufacturer of infant formula to make

a report to the FDA if it has knowledge that formula that has left an establishment under its

control and may be misbranded or adulterated, as was the case here.

44.     After her call with Dr. Hadley, Ms. O'Risky hoped to get a formal opinion about Mead Johnson's reporting obligations, but when she asked Mr. Barringer whether they would have a follow-up Quality Council meeting to discuss the issue, he declined.

45.     Before she received a response to her Integrity Concern complaint, Ms. O'Risky had an unsettling conversation with Dr. Van Dael that made clear her that her efforts to press the eight-ounce RTU issue had upset management and, in particular, Mr. Jobe. As Ms. O'Risky prepared to leave work on April 15, 2015, Dr. Van Dael entered her office, closed the door, and asked Ms. O'Risky whether she trusted him. Ms. O'Risky was unsure how to respond to her manager, but said she did trust him. Dr. Van Dael then told her firmly that she needed to drop the subject of the eight-ounce RTU seal defects. He promised that in the future, their team would find another way to go about addressing quality concerns without making Jeff Jobe uncomfortable. Dr. Van Dael tried to assure Ms. O'Risky that she was not in trouble, but she said she had heard that Mr. Jobe was very annoyed that she had brought forward her concerns. Dr. Van Dael acknowledged that that was true. The incident was upsetting to Ms. O'Risky, and she feared for the security of her employment. Nevertheless, she was not satisfied with a promise to do things better in the future when there was a likely defect in Mead Johnson's products that put infants at risk of harm.

46.     Ms. O'Risky knew that Mead Johnson was failing to meet its legal and regulatory obligations, and she had evidence that Mead Johnson's management team knew or should have known the same. At her request, Dr. Ozadali provided to her the slides from a February 18, 2015 training attended by members of the Mead Johnson's North American Quality team. Cathy Weir, Global Science Educator for the Mead Johnson's Pediatric Nutrition Institute, informed

Ms. O'Risky that Dr. Ozadali had given the training in tandem with Kirk Dolan, a Michigan State University professor whom the FDA has recognized as an instructor on processes and controls for low-acid canned foods. The training made clear that Mead Johnson was obligated to follow the regulations for LACF, set forth in 21 C.F.R. § 113, something that Dr. Mullane had denied. The training also noted that under 21 C.F.R. § 108, Mead Johnson was required to register any changes to its bottling process and/or systems with the FDA, which it did not do when changes were made to the eight-ounce RTU critical package component and process.

47.     The LACF regulations made clear that Mead Johnson was required to inform the FDA of any spoilage or process deviation that enters distribution. Moreover, the regulations not only limit deviations to the processing of the product itself, but also to seal failures. Nevertheless, Nancy Hornbrook, who was responsible for providing such information to the FDA, had not reported the deviations, complaints or spoilage to the FDA, and Mead Johnson had decided to classify the deviations – both internally and to regulators – as "nonconformities," misleadingly suggesting that the problem was not a systemic one.

48.     Shortly after her meeting with Dr. Van Dael, Mead Johnson began a compliance investigation based on her Integrity Concern complaint. Jennifer Zerm, the Vice President of Risk and Compliance, who was based in Glenview, Illinois, corresponded with Ms. O'Risky. Ms. O'Risky expanded on her concerns and reiterated that Mr. Jobe intimidated people from speaking up about quality, food safety, regulatory and compliance issues. She provided Ms. Zerm with a host of documents regarding complaint handling and her specific compliance concerns. Ms. O'Risky also recommended individuals to interview who might have relevant information, including Ms. Witt, all members of the Quality Council, including Mr. Jobe and Mr. Barringer, Dr. Shira, Dr. Mullane, and Dr. Ozadali. Ms. Zerm assured Ms. O'Risky that

16

Compliance would try to preserve the confidentiality of her complaint. Ultimately, however, it became clear to Ms. O'Risky's colleagues and supervisors that she was the source of the complaint.

49.     In early May 2015, Ms. Zerm and two internal investigators from Deloitte & Touche traveled to the Evansville office to conduct interviews. The interviews focused on, *inter alia*, contaminated formula, complaint handling, the organization's response to compliance concerns and non-conformity investigations and the eight-ounce RTU spoilage issues – issues that Ms. O'Risky had been raising for months. The interviews also focused on concerns expressed by Ms. O'Risky that some members of the senior leadership team were encouraging the organization to take more compliance risk, directly contradicting the directive to highly prioritize regulatory compliance that Kasper Jakobsen, Chief Executive Officer, had announced at the start of 2015.

50.     Ms. O'Risky knew that her colleagues would identify her as the source of the Integrity Concern complaint, given the focus of the investigation. Indeed, Dr. Van Dael explicitly confirmed in a meeting with Ms. O'Risky in May 2015 that he and others suspected that Ms. O'Risky had initiated the investigation.

### Commencement of the Retaliatory Campaign against Ms. O'Risky

51.     Ms. O'Risky began to experience retaliation for her protected activity soon after she first raised the eight-ounce RTU issue, and the problems persisted thereafter. In April 2015, Ms. O'Risky reported to LeaAnn Newmann, Vice President of Human Resources, that she was concerned about how Mead Johnson was handling quality issues, and she noted that Mead Johnson had been without a permanent Vice President of Quality for nearly a year. Ms. O'Risky told Ms. Newmann that she would like to be considered for the position, if not permanently, then

at least on an interim basis. Ms. Newmann said that she did not think that Ms. O'Risky was qualified because she did not have an advanced relevant technical degree – Mr. Jobe had only an MBA but had been acting in the role since Dr. McCullough's departure – but said that she would ask Mr. Jobe. A few days later, Ms. Newmann informed Ms. O'Risky that she had spoken with Mr. Jobe, and that Mr. Jobe had said he was unwilling to consider Ms. O'Risky for the position because she "challenged him too much." Ms. Newmann recommended that Ms. O'Risky speak with her manager to obtain more feedback regarding Mr. Jobe's reasons for not supporting her for the Vice President position. In a subsequent one-to-one meeting, Ms. O'Risky's manager, Dr. Van Dael, told her that Mr. Jobe had said he did not support her because she was more prone to "circle the wagons and gain a consensus within the organization to further support her positions, rather than backing down when instructed." This was a clear reference to her opposition to quality and compliance violations, including the eight-ounce RTU seal and spoilage problems, and direct evidence of Mr. Jobe's retaliatory animus.

52.     The retaliatory campaign against Ms. O'Risky extended beyond the refusal to consider her for a Vice President position specifically because she had engaged in protected activity. Dr. Van Dael also told her to discontinue her involvement with the team assigned to investigate the eight-ounce RTU seal and spoilage problems, warning her that it was a sensitive issue and that it made Mr. Jobe uncomfortable. Dr. Van Dael told her that Dr. Mullane, Dr. Shira, Dr. Hadley and Ms. Eisenhut were responsible for addressing the issue, and he dismissed her concerns that they would not do so properly, telling Ms. O'Risky that she "can't solve all the world's problems." Additionally, Ms. Eisenhut, who was responsible for conducting the root-cause analysis, excluded Ms. O'Risky from any related discussions of the analysis and any proposed corrective actions. Moreover, Mr. Jobe regularly supported canceling Quality Council

18

meetings, which Ms. O'Risky would have led – and at which she first raised the eight-ounce RTU issue. Ms. O'Risky was thus increasingly marginalized, in clear response to her objections to Mead Johnson's failure to address a serious compliance concern in accordance with Mead Johnson's legal obligations.

### Ms. O'Risky's Participation in the Internal Compliance Investigation and Second Integrity Concern Complaint

53. In or around late June 2015, Ms. O'Risky received an update from Ms. Zerm regarding her Integrity Concern complaint. Ms. Zerm said that she had concluded the investigation and had generated recommendations, but she could not disclose to Ms. O'Risky the outcome or the substance of the recommendations. From Ms. O'Risky's perspective, however, nothing had changed. Mr. Jobe remained in his role overseeing Quality, and Mead Johnson took no effective steps to address the eight-ounce RTU issue or report it to the FDA.

54. In late August 2015, Ms. Zerm and her subordinate, Brandon Young, Director of Compliance, met Ms. O'Risky at a restaurant to discuss her complaint. Ms. Zerm seemed to understand the seriousness of the issue, and she said she had escalated the issue to her supervisor, Vernon McCrory, the Senior Vice President of Risk and Compliance. After the meeting, Ms. O'Risky continued to send Ms. Zerm additional information regarding the seal failure, including: the February 18, 2015 training regarding low-acid canned foods; complaint files and records for the eight-ounce seal failures; audit findings from her team's internal audit of the Evansville manufacturing facility; and examples of other non-conformity-related food safety investigations that demonstrated a lack of appropriate risk management. Ms. Zerm expressed concern about the Supply Chain's apparently common practice of continuing to release into the market goods that were potentially implicated in non-conformity investigations – precisely what they had done with respect to the eight-ounce RTU seal and spoilage issue.

55.     Although she was no longer privy to most discussions about the seal issues with the eight-ounce RTU product, Ms. O'Risky remained concerned by Mead Johnson's failure to act. She therefore filed a second Integrity Concern hotline complaint in August 2015. In this complaint, Ms. O'Risky detailed her concerns about the eight-ounce RTU issue and Mead Johnson's refusal to fulfill its legal obligations with respect to reporting, safety and quality. She summarized the investigations, such as they were, and the efforts to downplay the associated risks and the consumer complaints Mead Johnson had received.

56.     That same month, the FDA conducted a routine inspection of the Mead Johnson facility in Evansville, which included a review of a sample of the several thousand consumer complaints Mead Johnson receives every month. Based upon available information, Mead Johnson's disclosures to the FDA did not reveal the full scope of the RTU problem or the shortcomings of its investigation and remedial measures.

57.     Eventually, in or around late October 2015, Mead Johnson greatly restricted distribution of eight-ounce RTU product that might have been affected by the hermetic seal defect. By this time, Ms. O'Risky had learned from two colleagues that Mead Johnson had made a component change to the seal multilayer film, substituting a polymer that melted at a lower temperature and was often melting during the sterilization process. Ms. O'Risky knew that this polymer – whatever its composition – had not been approved by the FDA for use in Mead Johnson's production process.

**Ms. O'Risky's Continued Marginalization and Retaliatory Termination**

58.     In the meantime, Ms. O'Risky's quality and compliance efforts continued to meet resistance, and Mead Johnson's management team made it increasingly difficult for her to do her job. One of her main objectives for 2015 was to update Mead Johnson's Quality Manual

regarding quality or regulatory outcomes. After receiving input from stakeholders and making requested revisions, she began circulating a final draft for execution in August 2015. Dr. Hondmann signed immediately, but Mr. Barringer let the document sit for a month and refused to respond to telephone calls or emails about it. Eventually Ms. O'Risky went to his secretary and retrieved the document, which she passed on to Dr. Rudolph for his signature. In October, Ms. O'Risky left the document with Mr. Jobe's secretary, Carolyn Sumner, and asked her to have Mr. Jobe sign it. Ms. Sumner contacted Ms. O'Risky not long thereafter and said that Mr. Jobe would not sign the document and would only discuss it with Dr. Hondmann. By the time of Ms. O'Risky's termination, no one had discussed Mr. Jobe's objections with her, and the manual still had not been finalized.

59.     While Ms. O'Risky continued to experience hostility and exclusion, she was reassured that her position was safe after Mead Johnson's earnings call on October 22, 2015. During the call, Company executives told investors that "compliance [would] remain a key component of the way [Mead Johnson does] business." Management said that it was for that reason that Mead Johnson had not included compliance in its Fuel for Growth initiative, a cost-cutting plan that was to involve a significant number of layoffs. Undoubtedly, Mead Johnson's representations concerning compliance were related to its recent settlement of Foreign Corrupt Practices Act claims, which had followed an investigation by the Securities and Exchange Commission.

60.     Shortly after the investor call, Ms. O'Risky was also heartened when she received a document that suggested that Mead Johnson recognized the need to focus on quality issues. Dr. Braun had emailed Charles Urbain, Chief Operating Officer, and Ms. O'Risky an excerpt of a presentation that Dr. Braun had given to the Science and Technology Committee of the Mead

Johnson's Board of Directors. The presentation included a heat map showing that product quality – the primary focus of Ms. O'Risky's work – was a high-risk and potentially high-cost area of concern for Mead Johnson. The presentation noted the need to take a number of steps consistent with what Ms. O'Risky had long advocated, including broadening its quality monitoring program, establishing a single set of quality standards and global quality manual, hiring a new Vice President of Quality – which would mean Mr. Jobe would no longer hold the dual role that she had identified as creating a conflict of interest – and making organizational changes and upgrading talent.

61.     On November 10, 2015 – less than three months after Ms. O'Risky's second Integrity Concern complaint – Ms. Newmann, Vice President of Human Resources, informed Ms. O'Risky that Mead Johnson had decided to terminate her. Ms. Newmann and Dr. Van Dael specifically cited the Fuel for Growth initiative as the reason for the termination.

62.     Notably, Mr. Jobe, who openly expressed animus towards Ms. O'Risky for the quality issues she raised, was an architect of the Fuel for Growth initiative, and had acknowledged as much in a meeting with internal Research & Development staff after the October 22, 2015 investor call.

63.     Mead Johnson carried out Ms. O'Risky's termination in a manner to humiliate her and punish her for her protected activity. Dr. Van Dael accompanied Ms. O'Risky from the conference room, where she was told of her termination, to her office, where an information systems staff member promptly arrived and confiscated her computer. Shortly thereafter she was escorted out of the building. None of the other approximately fifty employees terminated from the Evansville facility was similarly treated as though her termination was a result of misconduct. In fact, many were allowed to enter and leave the premises for the two weeks

between the announcement of their terminations and their official last day with Mead Johnson. At least one other colleague, a Director in R&D, was allowed to work through the end of the year, ensuring she would be eligible to receive her full bonus. Other employees were also permitted to use the fitness center, housed on the Mead Johnson's campus in a separate, controlled building. In sharp contrast, Ms. Newmann specifically told Ms. O'Risky that she would no longer be permitted to do so (even though membership fees continued to be deducted from her pay as payroll deductions over the subsequent pay periods).

64.     As a result of the retaliation to which Mead Johnson subjected her, Ms. O'Risky has suffered, and will continue to suffer, significant financial, emotional and reputational harm.

**COUNT 1:     RETALIATION IN VIOLATION OF THE FOOD SAFETY MODERNIZATION ACT, 21 U.S.C. § 399d**

65.     Plaintiff hereby incorporates by reference as though restated each of the factual allegations contained in paragraphs 1 through 64 above.

66.     Under the Food Safety Modernization Act ("FSMA"), 21 U.S.C. § 399d, it is unlawful an employer engaged in the manufacture, processing, or distribution of food may not discharge or otherwise discriminate against an employee because she provided to her employer information relating to conduct that she reasonably believed to be a violation of the Food, Drug & Cosmetics Act, or because she objected to, or refused to participate in, such conduct.

67.     The Company is subject to the anti-retaliation provisions of the FSMA because it is engaged in the manufacture, processing, and distribution of food, including infant baby formula.

68.     Ms. O'Risky engaged in protected activity within the meaning of FSMA many occasions throughout the spring, summer, and early fall of 2015. She reported to numerous managers her belief that the Company had not adequately investigated the root cause(s) of the

eight-ounce RTU spoilage and seal failure issues; that it had not taken appropriate steps to notify and protect consumers; and that it had not fulfilled its legal duties to report the deviations and possible adulterations to the FDA. She was very specific in her complaints, citing to applicable FDA rules under the Infant Formula Act and LACF regulations, and providing examples of analogous cases in which the FDA sanctioned companies for failing to take appropriate steps to remedy similar defects. When management failed to act, she also reported her concerns through MJN's Integrity Concern hotline on two occasions, and she met repeatedly with compliance personnel, providing them with information on the problems she observed.

69.     The Company was aware that Ms. O'Risky engaged in protected activity because she complained directly to her supervisors, colleagues, through the Integrity Concern hotline, and to compliance personnel. Dr. Van Dael explicitly confirmed that he and other of Ms. O'Risky's colleagues were aware that she was the source of the first Integrity Concern hotline complaint, which led to an investigation and interviews of MJN employees.

70.     The Company marginalized Ms. O'Risky, denied her promotion to Vice President, and terminated her employment in response to her protected activity. The reason given for Ms. O'Risky's termination is pretextual and inconsistent with the Company's statements to investors and its handling of her termination.

71.     The Company's actions have caused and will continue to cause Ms. O'Risky substantial economic loss, including lost salary, bonuses, benefits, stock options and restricted stock units, and other compensation; damage to her professional reputation; and emotional distress.

**COUNT 2:     RETALIATION IN VIOLATION OF THE SARBANES-OXLEY ACT, 18 U.S.C. § 1514A**

72.     Plaintiff hereby incorporates by reference as though restated each of the factual

24

allegations contained in paragraphs 1 through 71 above.

73.    Under 18 U.S.C. § 1514A, it is unlawful for a covered employer to discriminate against an employee for providing information which the employee reasonably believes constitutes mail fraud, wire fraud, bank fraud, securities or commodities fraud, a violation of any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information is provided to a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

74.    Ms. O'Risky repeatedly engaged in protected activity by complaining that the Company had not adequately investigated the root cause(s) of the eight-ounce RTU spoilage and seal failure issues; that it had not taken appropriate steps to notify and protect consumers; and that it had not fulfilled its legal duties to report the deviations to the FDA.

75.    Ms. O'Risky's complaints and opposition to the Company's handling of the eight-ounce RTU related to fraud on both consumers and shareholders.  Consumers reasonably relied on the safety and sterility of MJN's liquid formula, and the Company's failure to correct their misunderstanding constitutes fraud.  Ms. O'Risky also noted that the Company misrepresented to the FDA the nature of the defects it had discovered, and failed to report deviations.  Moreover, by refusing to disclose to the SEC and investors that the Company had been forced to shut down production and distribution of a major product due to a defect, and that it would need to conduct a recall – or at least should have – the Company failed to acknowledge a risk that could have cost the Company tens of millions of dollars.

76.    The Company was aware that Ms. O'Risky had engaged in protected activity, because she complained directly to her supervisors, colleagues, through the Integrity Concern

25

hotline, and to compliance personnel. Dr. Van Dael explicitly confirmed that he and other of

Ms. O'Risky's colleagues were aware that she was the source of the first Integrity Concern

hotline complaint, which led to an investigation and interviews of MJN employees.

77.     The Company marginalized Ms. O'Risky, denied her promotion to Vice President,

and terminated her employment in response to her protected activity. The reason given for Ms.

O'Risky's termination is pretextual and inconsistent with the Company's statements to investors

and its handling of her termination.

78.     The Company's actions have caused and will continue to cause Ms. O'Risky

substantial economic loss, including lost salary, bonuses, benefits, stock options and restricted

stock units, and other compensation; damage to her professional reputation; and emotional

distress.

**COUNT 3:**     **RETALIATION IN VIOLATION OF
THE DODD-FRANK ACT, 15 U.S.C. § 78u-6(h)**

79.     Plaintiff hereby incorporates by reference as though restated each of the factual

allegations contained in paragraphs 1 through 78 above.

80.     At all times relevant to this Complaint, Ms. O'Risky was an employee of Mead

Johnson and the Mead Johnson was Ms. O'Risky's employer.

81.     Under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,

15 U.S.C. § 78u-6(h) ("Dodd-Frank"), it is unlawful for an employer to discriminate against a

whistleblower for any act done by the whistleblower in making disclosures that are "required or

protected" under the Sarbanes-Oxley Act of 2002.

82.     Under the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, it is unlawful for a

covered employer to discriminate against an employee for providing information which the

employee reasonably believes constitutes mail fraud, wire fraud, bank fraud, securities or

commodities fraud, a violation of any rule or regulation of the Securities and Exchange

Commission, or any provision of Federal law relating to fraud against shareholders, when the

information is provided to a person with supervisory authority over the employee (or such other

person working for the employer who has the authority to investigate, discover, or terminate

misconduct).

83.     Ms. O'Risky engaged in protected activity repeatedly by complaining that Mead

Johnson had not adequately investigated the root cause(s) of the eight-ounce RTU spoilage and

seal failure issues, that it had not taken appropriate steps to notify and protect consumers, and

that it had not fulfilled its legal duties to report the deviations to the FDA.  When management

failed to act, she also reported her concerns through Mead Johnson's Integrity Concern hotline

on two occasions, and she met repeatedly with compliance personnel, providing them with

information on the problems she observed.  Ms. O'Risky's complaints and concerns were well-

documented and unambiguous, and they continued until her termination.

84.     Ms. O'Risky's complaints and opposition to Mead Johnson's handling of the

eight-ounce RTU clearly implicated fraud, both on consumers and shareholders.  Consumers

reasonably relied on the safety and sterility of Mead Johnson's liquid formula, and Mead

Johnson's failure to correct their misunderstanding constitutes fraud.  Ms. O'Risky also noted

that Mead Johnson misrepresented to the FDA the nature of the defects it had discovered, and

failed to report deviations.  Moreover, by refusing to disclose to the SEC and investors that Mead

Johnson had been forced to shut down production and distribution of a major product due to a

defect, and that it would need to conduct a recall – or at least should have – Mead Johnson failed

to acknowledge a risk that could have cost Mead Johnson tens of millions of dollars.

85.     Mead Johnson was aware that Ms. O'Risky had engaged in protected activity

27

because she complained directly to her supervisors, colleagues, through the Integrity Concern hotline, and to compliance personnel. Dr. Van Dael explicitly confirmed that he and other of Ms. O'Risky's colleagues were aware that she was the source of the first Integrity Concern hotline complaint, which led to an investigation and interviews of Mead Johnson's employees.

86.    Mead Johnson marginalized Ms. O'Risky, denied her promotion to Vice President, and terminated her employment in response to her protected activity. The reason given for Ms. O'Risky's termination is pretextual and inconsistent with Mead Johnson's statements to investors and its handling of her termination.

87.    Mead Johnson's actions have caused and will continue to cause Ms. O'Risky substantial economic loss, including lost salary, bonuses, benefits, stock options and restricted stock units, and other compensation; damage to her professional reputation; and emotional distress.

## COUNT 4:    RETALIATORY DISCHARGE IN VIOLATION OF THE PUBLIC POLICY OF THE STATE OF ILLINOIS

88.    Plaintiff hereby incorporates by reference as though restated each of the factual allegations contained in paragraphs 1 through 87 above.

89.    Illinois common law recognizes an exception to the at-will employment rule where an employee's termination violates public policy. To prove this exception to the at-will employment rule, the plaintiff must show: (1) the employment was terminated by the employer, (2) the discharge was in retaliation for action of the employee, and (3) the discharge violates a clear mandate of public policy. Retaliatory discharge includes situations where, as here, the employee is discharged in retaliation for reporting illegal or improper conduct, and under Illinois precedent, internal reports to supervisors are protected. A clear mandate of public policy can be found in the constitution, laws and judicial decisions of Illinois, as well as federal law.

90.     Ms. O'Risky was terminated by Mead Johnson in retaliation for making internal reports about illegal or improper conduct.

91.     The various issues that Ms. O'Risky raised are each clear mandates of public policy found in federal statutes, rules, and regulations. These statutes include the low-acid canned food regulations promulgated by the FDA, 21 C.F.R. § 113, which mandate reporting on spoilage and seal deviations of canned foods to the FDA, and which are incorporated into the Infant Formula Act, 21 U.S.C. § 350a. As Ms. O'Risky asserted in conversations with Mead Johnson management, the Company was also obligated under 21 C.F.R. §§ 108.35(d) and (e), to report to the FDA "any instance of spoilage or process deviation the nature of which indicates potential health significance" and "any instance wherein any lot of such food . . . may be injurious to health be reason of contamination with microorganisms" where such food has entered distribution.

92.     Under Illinois law, punitive damages are available for victims of retaliatory discharge where the defendant acted with fraud, actual malice, deliberate violence or oppression, or where the defendant acted willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. Mead Johnson acted with actual malice, willfully, and/or with a wanton disregard for Ms. O'Risky's rights when the Company terminated her for her efforts to ensure that the Company complied with its obligations to produce safe infant formula and make required reports to the FDA.

93.     Mead Johnson's actions have caused and will continue to cause Ms. O'Risky substantial economic loss, including lost salary, bonuses, benefits, stock options and restricted stock units, and other compensation; damage to her professional reputation; and emotional distress.

29

## JURY DEMAND

Plaintiff hereby requests a trial by jury.

## REQUESTED RELIEF

Now, wherefore, Plaintiff prays this Court for the following relief:

1. Enter a judgment in Plaintiff's favor and against Mead Johnson for retaliation in violation
   of 21 U.S.C. § 399d, 18 U.S.C. § 1514A, and 15 U.S.C. § 78u-6(h), and for retaliatory
   discharge in violation of Illinois common law;

2. Order Mead Johnson to reinstate Ms. O'Risky to her former position or an equivalent
   position, or award her front pay in lieu of reinstatement;

3. Award Ms. O'Risky two times back pay, including the value of lost benefits and equity,
   pursuant to 15 U.S.C. § 78u-6(h);

4. Award Ms. O'Risky compensatory damages for the reputational harm and pain, suffering
   and emotional distress MJN's actions have caused her;

5. Award Ms. O'Risky punitive damages under Illinois common law for Mead Johnson's
   conduct in terminating her employment, which evidenced actual malice, willfulness, and
   wanton disregard for her rights;

6. Award Ms. O'Risky compensation for litigation costs, expert witness fees, and
   reasonable attorneys' fees incurred in bringing this complaint; and

7. Grant such other relief as the Court deems just and necessary.

Respectfully submitted,

Debra S. Katz
Adam Herzog
Michael A. Filoromo, III
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)
katz@kmblegal.com
herzog@kmblegal.com
filoromo@kmblegal.com


Stuart J. Chanen
Valorem Law Group
218 N. Jefferson Street
 Suite 300
Chicago, IL 60661
(312) 676-5480
(312) 676-5499 (fax)
Stuart.Chanen@valoremlaw.com

Attorneys for Complainant Linda O'Risky

DATED: February 8, 2017